**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

MELISSA F. BYRD                                                                              PLAINTIFF

V.                                          NO. 4:10CV00019 JTR

MICHAEL J. ASTRUE,
Commissioner, Social
Security Administration                                                                     DEFENDANT

**MEMORANDUM AND ORDER**

**I.  Introduction**

Plaintiff, Melissa F. Byrd, has appealed the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for Supplemental Security Income ("SSI").  Both parties have filed Appeal Briefs (docket entries #11 and #13), and the issues are now joined and ready for disposition.

The Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether it is based on legal error.  *Long v. Chater,* 108 F.3d 185, 187 (8th Cir. 1997); *see also* 42 U.S.C. § 405(g).  While "substantial evidence" is that which a reasonable mind might accept as adequate to support a conclusion,[1] "substantial evidence on the record

---

[1] *Reynolds v. Chater*, 82 F.3d 254, 257 (8th Cir. 1996).

as a whole" requires a court to engage in a more scrutinizing analysis:

> "[O]ur review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; we also take into account whatever in the record fairly detracts from that decision." *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision." *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995).

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005).

On February 27, 2007, Plaintiff filed an application for SSI, alleging disability since January 17, 2003 (Tr. 89, 99), based on mental disorders (anxiety attacks and thoughts of suicide) and diabetes. (Tr. 62). After her claims were denied at the initial and reconsideration levels, she requested a hearing before an Administrative Law Judge ("ALJ"). On August 26, 2008, the ALJ conducted an administrative hearing, during which Plaintiff and a vocational expert ("VE") testified. (Tr. 13-43).

At the time of the administrative hearing, Plaintiff was 40-years old, and had completed high school. (Tr. 18, 20). Her past work included jobs at a shoe company, gluing the insides of shoes (Tr. 22), and working for three days at a pickle plant. (Tr. 23). Plaintiff held both of those jobs over sixteen years ago, and, since that time, she has not worked. *Id.*

The ALJ considered Plaintiff's impairments by way of the familiar five-step sequential evaluation process. Step 1 involves a determination of whether the

claimant is involved in substantial gainful activity ("SGA"). 20 C.F.R. § 404.1520(a)(4)(I) (2005), §416.920. If the claimant is, benefits are denied, regardless of medical condition, age, education, or work experience. *Id.*, § 404.1520(b), § 416.920.

Step 2 involves a determination, based solely on the medical evidence, of whether the claimant has a "severe" impairment, *i.e.*, an impairment or combination of impairments which significantly limits the claimant's ability to perform basic work activities. *Id.*, § 404.1520(4)(ii), § 416.920. If not, benefits are denied. *Id.*

Step 3 involves a determination, again based solely on the medical evidence, of whether the severe impairment(s) meets or equals a listed impairment which is presumed to be disabling. *Id.*, § 404.1520(a)(iii), § 416.920. If so, and the duration requirement is met, benefits are awarded. *Id.*

Step 4 involves a determination of whether the claimant has sufficient RFC, despite the impairment(s), to perform the physical and mental demands of past relevant work. *Id.*, § 404.1520(4)(iv), § 416.920. If so, benefits are denied. *Id.*

Step 5 involves a determination of whether the claimant is able to make an adjustment to other work, given claimant's age, education and work experience. *Id.*, § 404.1520(4)(v), § 416.920. If so, benefits are denied; if not, benefits are awarded. *Id.*

In his December 5, 2008 decision (Tr. 51-58), the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since February 27, 2007, the date she filed her application for SSI; (2) had "severe" impairments consisting of depression/anxiety disorder and diabetes, which did not meet a Listing; (3) had the RFC to perform light work, as long as it: (a) did not expose her to hazards such as unprotected heights or heavy machinery, and (b) involved unskilled work where interpersonal contact is incidental to the work performed; (4) had no past relevant work;[2] (5) was 38-years old, which is defined as a "younger individual" on the date she filed her application for SSI, with a high school education and the ability to communicate in English; and (6) considering her age, education, work experience, and RFC, there were jobs in the national economy that Plaintiff could perform, including positions as a fast food worker, product line assembler, and poultry deboner.[3] (Tr. 53-58). Thus, the ALJ held that Plaintiff was not disabled. (Tr. 58).

On November 19, 2009, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making it the final decision of the Commissioner. (Tr. 1-3). Plaintiff then filed her Complaint appealing that decision

---

[2]Because Plaintiff had no past relevant work, the ALJ found that the transferability of job skills was not an issue. (Tr. 57).

[3]In making this Step 5 determination, the ALJ relied on the testimony of a vocational expert. (Tr. 39-43, 57).

to this Court. (Docket entry #2).

## II. Analysis

In Plaintiff's Appeal Brief (docket entry #11), she argues that the ALJ erred: (1) in *not* finding her right foot limitations to be a severe impairment and *not* considering it in determining that her RFC allowed her to perform light work; and (2) in finding that her mental RFC allowed her to perform unskilled light work as long as interpersonal contact was incidental to the work performed. The Court concludes that both of Plaintiff's arguments have merit.

**A.    The ALJ's RFC Assessment Failed to Adequately Account for the Severe Impairment of Plaintiff's Right Foot**

On March 9, 2006, Dr. Jason Reed performed a "Morton's neurectomy" to remove "a large fibrotic and neurologic mass from the second interspace [on Plaintiff's] right foot." The cause of the mass was a "history of trauma and stepping on glass." (Tr. 157-158). On May 8, 2006, Plaintiff saw Dr. Reed for a "postoperative visit." (Tr. 161). The incision was "well-healed," with a "good range of motion of the second toe and third toe." However, Dr. Reed noted that Plaintiff continued to experience "a little bit of discomfort" due to "permanent numbness" resulting from the surgery to the "second metatarsal phalengeal joint, plantar aspect." *Id.* In discharging Plaintiff, Dr. Reed recommended that she "have an annual follow-up visit

by either her primary care physician or a foot specialist for neurologic and vascular evaluation secondary to her diabetes." *Id.*

On June 5, 2007, Dr. Rex Ross, a consulting physician, saw Plaintiff for a general physical examination. He noted Plaintiff's "Morton's neurectomy one 1 1/2 years ago" (Tr. 183) and diagnosed "chronic parathesias following surgery." (Tr. 189). Based on his physical examination, Dr. Ross found that Plaintiff had "mild" limitations in her ability to " walk" and " stand" due to "pain [in her] right foot." Importantly, Dr. Ross did not in any way quantify *how much* this mild limitation would restrict Plaintiff's ability to "walk" and "stand."

Notwithstanding the *undisputed* "permanent numbness" in Plaintiff's right foot following surgery and "chronic paratheseas," which Dr. Ross found caused a "mild limitation" in her ability to "walk" and "stand," the ALJ held that these problems did not rise to the level of a severe impairment.[4] In an effort to find some support for his conclusion, the ALJ *mischaracterizes* Dr. Reed's notes from his postoperative examination of Plaintiff on May 8, 2006. According to the ALJ, these notes reveal that Plaintiff told Dr. Reed she had "*no* residual pain" and that Dr. Reed noted only that Plaintiff had "slight discomfort as to one toe joint." (Tr. 55). In fact, Dr. Reed's notes

---

[4]A "severe" impairment is one which "significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c).

(Tr. 161) state that: (1) Plaintiff has "no pain to palpation"; and (2) "a bit of discomfort" in one toe joint "due to the *permanent numbness* incurred by the surgery." (Emphasis added).

Importantly, in concluding that Plaintiff's problems with her right foot did not constitute a severe impairment, the ALJ *completely ignored* the opinion of Dr. Ross, the consulting physician, who examined Plaintiff approximately one and one-half years after her foot surgery. By history, Dr. Ross noted Plaintiff's complaint of continuing pain in her right foot following "Mortons neurectomy." (Tr. 183). Based on his examination of her right foot, Dr. Ross noted that the top of the foot was tender and sensitive. (Tr. 187). He diagnosed "chronic pain" in Plaintiff's right foot following "Morton's neurectomy," and, based on his examination, he explicitly found that Plaintiff was "*mildly limited*" in her ability to walk and stand based on pain in her right foot. (Tr. 189). Dr. Reed's finding that Plaintiff had *permanent numbness* in her right foot following the surgery and Dr. Ross's finding that Plaintiff was *mildly limited* in walking and standing due to continuing pain in her right foot make it clear that Plaintiff's problem with her right foot constituted a "severe limitation." The ALJ erred in failing to so find at Step 2 of his evaluation.[5]

---

[5]The ALJ also failed to recognize that as a longtime diabetic, Plaintiff might have neuropathy in her lower extremities, particularly her toes and feet, that would make it difficult for her to walk. This is undoubtedly why Dr. Reed noted, in

More importantly, however, the ALJ committed reversible error in concluding that Plaintiff had the RFC to perform "light work." By definition, light work involves the ability to stand and walk for six hours a day.[5] While Dr. Ross did not quantify Plaintiff's "mild limitation" in standing and walking, there is *nothing* in the medical record to support what appears to be the ALJ's entirely subjective determination that Plaintiff was capable of standing and walking for six hours a day and, therefore, could perform "light work."

B.   **The ALJ's RFC Assessment Failed To Adequately Account For Plaintiff's Mental Limitations**

Between February 2007 and July 2008, Plaintiff was regularly seen by a psychiatrist and psychologist for serious mental problems. During this one and a half year period, her GAF was consistently between 40 and 45.[6] On only two occasions

---

discharging Plaintiff, that she should "have an annual follow-up visit by her primary care physician or a foot specialist for neurologic and vascular evaluation secondary to her diabetes." (Tr. 161). Finally, given this record, Plaintiff's testimony about experiencing continuing pain in her right foot and difficulty in walking seems, in general, to be *consistent with* the medical evidence.

[5]Social Security Ruling 83-10 defines "light work" as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds, with standing/walking for 6 hours in an 8-hour workday. *See also* 20 C.F.R. 404.1567(b).

[6]These GAF scores were as follows: February 5, 2007, GAF of 40 or 44 (Tr. 173, 163, 226); February 9, 2007, GAF of 40 (Tr. 166); February 19, 2007, GAF of

8

were her GAF scores above 50: October 1, 2007, GAF of 53 (Tr. 237); and October 22, 2007, GAF of 52 (Tr. 238). Her treating psychologist and psychiatrist diagnosed her, at various times, as suffering from "major depressive disorder, social anxiety, rule out PTSD, and rule out borderline personality disorder" (Tr. 173, 163, 226); "major depressive disorder, recurrent, severe, with psychotic features; anxiety disorder, rule out excessive compulsive disorder, rule out personality disorder with dependent features" (Tr. 231); and "mood disorder and anxiety disorder." (Tr. 235). Throughout this period of time, her treating physicians noted that Plaintiff sometimes displayed suicidal ideation (Tr. 240-241, 169) and that she had a history of "self mutilating behavior." (Tr. 169, 170; 183-191; 239). The medications she was prescribed to attempt to control these serious mental problems included: 1 mg of Risperdal (Tr. 233); 20 mgs of Prozac (Tr. 233); 10 mgs of Abilify (Tr. 182); 40 mgs of Prozac (Tr. 182); 100 mgs of Trazadone (Tr. 182); 1 mg of Lorazepam (Tr. 239).

On June 27, 2007, Plaintiff was seen by Dr. Nancy Toombs for a "Mental Diagnostic Evaluation." Dr. Toombs diagnosed Plaintiff with: Axis I major depressive disorder, panic disorder, PTSD (chronic); Axis II borderline personality disorder; and Axis III GAF 50. (Tr. 194). In assessing the effects of Plaintiff's mental impairments

---

40 (Tr. 175); April 2, 2007, GAF of 44 (Tr. 233); September 24, 2007, GAF of 40; February 19, 2008, GAF of 42 (Tr. 240); and July 1, 2008 GAF of 45 (241).

on her adaptive functioning, Dr. Toombs noted, among other things that:

> 4. *Her ability to cope with the cognitive demands of work tasks appears to be poor*. Her depression keeps her poorly motivated, she has difficulty staying focused. Panic is brought on by situations that are new and familiar.
>
> \*\*\*
>
> 6. . . . . she seems to do better with 1 to 1 interaction. I am unsure how she would do at the work setting without this level of support. Much of this would depend on how stable she is on medication.
>
> 7. She may need extra time when completing a new or unfamiliar task.

(Tr. 194-195) (Emphasis added).

On August 13, 2007, "Kay M. Gale," whose educational background is not specified, completed a "Psychiatric Review Technique" (Tr. 196- 209) and "Mental Residual Functional Capacity Assessment" (Tr. 210-212), based solely on her review of the medical records. After checking various boxes, Ms. Gale noted, without any elaboration, that Plaintiff "seems capable of unskilled work." (Tr. 208). Ms. Gale, again based solely on her review of the medical records, concluded, without any elaboration or explanation, that Plaintiff "is able to perform work where interpersonal contact is incidental to work performed, *e.g.* assembly work; complexity of tasks is learned and performed by rote, with few variables, uses little judgment; supervision required is simple, direct, and concrete. Unskilled work." (Tr. 212).

The Court finds Ms. Gale's conclusions to be utterly at odds with the far more detailed and well supported opinion of Dr. Toombs, who actually examined Plaintiff and engaged in detailed questioning of her before reaching much different conclusions about whether Plaintiff's long history of well-documented mental problems could be accommodated in a real-world workplace. Dr. Toombs found that Plaintiff: (1) had "poor ability" to cope with the cognitive demands of work tasks; (2) "panic is brought on by situations that are new and unfamiliar;" and (3) *"she seems to do better with one on one interaction"* in a work setting. These findings are in direct conflict with Ms. Gale's conclusory assertion that, notwithstanding all of Plaintiff's well-documented mental problems, she is capable of performing work as long as "interpersonal contact is incidental to the [the] work performed" and "supervision . . . is simple, direct, and concrete."

Finally, during the administrative hearing, the VE admitted, in response to questions from Plaintiffs counsel, that, for unskilled work, if Plaintiff had a GAF of 50 or below, "the scale says the person is unable to work" and there would be "no jobs" available for such a hypothetical claimant. (Tr. 42-43).

In his decision, the ALJ largely ignores Plaintiff's medical history associated with her serious mental problems and her lengthy and well-documented history of having GAF scores of 50 or below. He also ignores those portions of Dr. Toombs's

report that raise serious questions regarding "how she [Plaintiff] would do at the work setting without this level of [one-on-one] support." (Tr. 194-195). Instead, to support his mental RFC assessment, he uncritically accepts Ms. Gales's Functional Capacity Assessment (Tr. 212), which is based entirely on her review of the medical records. Finally, the ALJ offers no explanation of why he is adopting the opinion of Ms. Gale over that of Dr. Toombs, an examining consultant.

### III. Conclusion

Thus, the Court concludes that the medical record in this case fails to contain substantial evidence sufficient to support the ALJ's assessment of Plaintiff's mental RFC or his Step 5 determination that there are jobs in the national economy which Plaintiff is capable of performing. On remand, the ALJ should fully develop the record regarding whether Plaintiffs "mild limitation" in standing and walking will actually allow her to perform light work. The ALJ should also carefully consider the opinions of Plaintiff's treating and consulting mental health specialists, along with her well-documented longitudinal history of GAF scores of 50 or below, in deciding her mental RFC and whether, at Step 5, there are jobs available in the national economy that Plaintiff is able to perform.

IT IS THEREFORE ORDERED THAT the Commissioner's decision is reversed and this matter is remanded to the Commissioner for further proceedings

pursuant to "sentence four" of 42 U.S.C. § 405(g) and *Melkonyan v. Sullivan*, 501 U.S. 89 (1991).

DATED this 22nd day of December, 2010.

```
_____
UNITED STATES MAGISTRATE JUDGE
```